IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


DAVID WAYNE BENDS,                                    Civil No. 10-129-HZ

      Petitioner,                                OPINION AND ORDER

   v.

MARK NOOTH,

      Respondent.

ANTHONY D. BORNSTEIN
Office of the Federal Public Defender
101 S.W. Main St., Suite 1700
Portland, OR  97204

    Attorney for Petitioner


JOHN KROGER
Attorney General
KRISTEN E. BOYD
Oregon Department of Justice
1162 Court Street, NE
Salem, OR  97301

    Attorneys for Respondent

1 - OPINION AND ORDER -

Hernandez, District Judge.

Petitioner, an inmate at Snake River Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. He challenges his 2001 conviction and sentencing for Aggravated Murder, alleging he was denied his right to due process under the Fourteenth Amendment, and his right to the effective assistance of trial and appellate counsel under the Sixth and Fourteenth Amendments. (#14.) In his supporting memorandum, Petitioner argues he is entitled to relief because trial counsel failed to thoroughly investigate and prepare for trial, particularly with respect to an alternative suspect, and because there is no indication trial counsel investigated mitigation for the penalty phase. (#31, at 13; 15-16.) For the reasons set forth below, the Amended Petition for Writ of Habeas Corpus (#14) is DENIED, and this proceeding dismissed.

## **BACKGROUND**

In 1997, Petitioner and his wife lived with his wife's sister, Robin Whitehurst, and her two children. The afternoon of March 4, 1997, Petitioner and his wife found Ms. Whitehurst strangled in their apartment. In 2001, Petitioner was charged with Aggravated Murder and Murder in the strangulation death of his sister-in-law. The indictment alleged Petitioner fraudulently cashed checks and used the victim's debit card on March 1, 1997; assaulted her on March 4, 1997; and killed her on March 4, 1997 to conceal his

2 - OPINION AND ORDER -

criminal acts. (Respt.'s Ex. 102.) The trial court appointed two attorneys to represent Petitioner. After a period of investigation, counsel moved to withdraw due to an unwaivable ethics conflict. (#23, Tr. Vol. 1.) Petitioner consented to having counsel turn over discovery to new attorneys. (*Id.* at 7.) Replacement counsel was appointed, and Petitioner proceeded to trial before a jury.[1]

At trial, the State argued Petitioner had the motive and opportunity to murder his sister-in-law and presented evidence of his conflicting and inconsistent accounts of his whereabouts and activities in the days before the murder and on the day of the murder.[2] Petitioner's wife testified, in relevant part, that on March 3, 1997, the day before her sister was killed: Petitioner was supposed to pick her up from work at 5 p.m. but called to say he was tied up at work, so her sister picked her up; Petitioner came home at approximately 10:30 p.m. and told her he had been helping his boss pull his vehicle from a ditch and it would earn him $200, and that his boss's wife, who worked at Kmart, gave him the shoes he brought home for her; around midnight, Petitioner told her he

---

[1]After a number of settlement conferences and against the advice of counsel, Petitioner rejected the State's plea offer of a stipulated 12 year sentence for Manslaughter in the First Degree. (#22 Ex. 125.)

[2]By the time of the trial, Petitioner and the victim's sister had divorced. The Court refers to her as Petitioner's wife, her status at the time of the events she testified to.

3 - OPINION AND ORDER -

had less than a quarter gram of meth.  (Tr. Vol. 4 at 83-86.)  With respect to events on March 4, 1997, Petitioner's wife testified: (1) Petitioner took her nephew, Michael, to school between 7:45 and 7:50 a.m.; while he was gone, she saw her sister empty her purse on the dining room table and thoroughly search it and her wallet looking for her missing debit card, but her sister did not find the card (*id.* at 88-89); (2) her sister told her she "couldn't figure out how her account was overdrawn because other than her debit card, in the last month she had only written five checks" (*id.* 88); (3) when Petitioner returned, he and his sister-in-law discussed meeting at her bank at noontime so he could give her rent money and "a quarter" of meth (*id.* at 89-90); (4) the noontime meeting was cancelled after Petitioner told his wife he didn't have enough meth to give her sister, and he didn't want to go to Oregon City to get it (*id.* at 89-90; 109-111); (5) that morning she gave her sister $25 cash for half the cable installation, scheduled for between 1 and 5 p.m. that day (*id.*; and at 92); (6) her sister called from work at approximately 9:10 a.m. to make sure she and Petitioner would be able to pay their share of the rent (*id.* at 90-91); (7) she, Petitioner, and her 2-year-old niece took their truck [Chevy Blazer] to do laundry at approximately 11 a.m. (*id.* at 92); (8) the laundromat in Sellwood was too busy so they went to the Alpine Laundry on Highway 99, arriving at approximately 11:30 a.m. (*id.* at

95); (9) Petitioner left at approximately 11:40 a.m., saying he was going to a transmission shop nearby, and she reminded him it would only take her 30 minutes to do the laundry and to return quickly (*id*. at 95-96); (10) Petitioner returned to the laundromat, on foot, at approximately 1:10-1:15 p.m. and she was furious (*id*. at 96); (11) Petitioner told her he had run out of gas and the truck wouldn't start after he put gas in because the flywheel wasn't lining up properly (*id*. at 96-97); (12) she challenged him, telling him she had just seen him drive past "like five minutes ago" (*id*. at 97); (13) at approximately 1:30 p.m. they called a cab to go to the freeway ramp where Petitioner left the truck (*id*. at 98); (14) Petitioner started the truck and she insisted they go to McDonald's to get lunch for her niece (*id*. 98-99); (15) at about 2:35 p.m. she asked Petitioner to go to the phone booth and call home to see if her nephew was home from school and if the cable installer had been by (*id*. at 99); (16) Petitioner returned saying Michael wasn't home yet and he was going to go pick-up the laundry (*id*. at 99); (17) Petitioner returned to the McDonald's within 10 minutes, with Michael (*id*.); (18) at 2:55 p.m. she told the kids they had to leave in 5-10 minutes (*id*. at 100); (19) they left to pick up the laundry, then drove to Beaverton where Petitioner told her he would be picking up his pay-check from his boss (*id*. at 100-101); (20) Petitioner went into a building and upon returning told her he was

5 - OPINION AND ORDER -

paid $300 cash, but that the $200 he earned for pulling his boss's car out the day before had not yet been approved (*id.* at 101); (21) she was upset because they didn't have their share of the rent; they arrived home around 4:15-4:30 p.m., and noticing her sister's car in the driveway she told the kids their mom was home early (*id.*); (22) upon entering, the house was quiet, the dog was scratching at the garage door, and Petitioner attended to the dog (*id.* at 102); (23) she sent the kids upstairs, then walked through the kitchen and noticed the dining room table was shattered; Petitioner said her name "a couple of times in a very eery voice" and as she went through the kitchen, he stepped to the side and she saw her sister on the floor (*id.*); (24) she immediately told Petitioner to call 911 and she started CPR, at which time she found a cord wrapped around her sister's neck (*id.*); she continued CPR until paramedics arrived (*id.* at 104).

The cab driver testified Petitioner told her his vehicle's starter overheated. (Tr. Vol. 6 at 93-102.) An expert in auto mechanics testified that upon inspection and testing of Petitioner's 1974 Chevy Blazer he did not find any evidence of the mechanical problems the witnesses testified Petitioner claimed existed. (Tr. Vol. 6 at 23-59.) The expert attributed any difficulty in starting the vehicle to a loose battery cable, which could be overcome by jiggling it. (*Id.*)

It was undisputed that Petitioner, his wife, and his sister-in-law used methamphetamine. The medical examiner testified there was evidence the victim used methamphetamine in a window of five to ten minutes to no more than two hours prior to her death; because of the levels of meth detected in the autopsy, the drug use was more likely to have occurred five to ten minutes prior to death; the victim's debit card was in her purse when the purse was inventoried. (Tr. Vol. 7, at 17-18.)

The cable installer testified: he initially arrived at the victim's residence early, at approximately 11:15 a.m.; there was no car in the driveway; no one answered the door; in checking around back, he noticed the curtains on the sliding door partially open and toys on the floor; he called to have someone telephone the residence, could hear the phone ring, but no one answered; he left at approximately 11:30 a.m. (Tr. Vol. 6 at 6-10). He further testified he returned to the residence at approximately 1:15 p.m.; there was an older Corolla station wagon in the driveway; no one answered the front door so he looked around back and noticed the curtains were now closed; he again called to have someone telephone the residence, he could hear the phone ring, but no one answered; he filled out a door tag marking the time as 1:25 p.m. (*Id*. at 10-22.) The door tag was entered into evidence. (*Id*.)

A coworker testified that around noon she conveyed a telephone message from a male with a deep voice, asking that Ms. Whitehurst

7 - OPINION AND ORDER -

call home; shortly thereafter Ms. Whitehurst was on the phone. (Tr. Vol. 4 at 65-66.)   Another coworker also testified to the phone calls, and to the victim leaving work saying she needed to take care of something and leaving her lunch on her desk. (*Id*. 58-59.)   The victim's boss testified he left the workplace at 12:15 p.m. and in a brief exchange as he was leaving the victim mentioned she was also leaving. (*Id*. at 71.)

A neighbor moving into one of the adjacent apartments testified she saw the victim's dog chained to the back deck at 12:30 p.m. and heard "a constant yap" while she and her dad quickly ate lunch.   At approximately 12:45 p.m. she noticed the dog had stopped barking and saw that he was gone.   (Tr. Vol. 6, 117-126.)

A carpenter who employed Petitioner for a week in late February 1997 testified: on March 4, 1997, he owed Petitioner approximately $110 for one day's work but he did not have an appointment to meet Petitioner that day; Petitioner knew to call his home to reach him; he never had any affiliation with any business at the location in Beaverton where Petitioner took his wife on March 4th; he was not with Petitioner on the evening of March 3, 1997, and at no time did Petitioner help pull his or his wife's vehicle out of a ditch; his wife did not work at K-mart; he never paid any employee in cash; Petitioner left a message at his home sometime in mid-March; Petitioner called back sometime near April and he met and paid Petitioner the next day. (Tr. Vol. 6 at

8 - OPINION AND ORDER -

151-161.)

The parties stipulated to the testimony of the victim's son, Michael, 11-years old at the time of the murder. (Trial Tr. Vol. 7, at 54.) The stipulation established Michael would have testified: (1) he always rode the bus home from school; (2) on March 4, 1997, Petitioner picked him up at school; (3) when Michael asked why he was being picked up, Petitioner told him: he made a wrong turn and ended up at the school, that the boy's Aunt Melanie was waiting at a McDonald's, and that Petitioner was suppose to pick up laundry nearby so Petitioner just thought he would pick him up; and (4) at the McDonald's, Petitioner went under the hood of the car to get it started and his aunt told him the starter and the transmission to the truck were bad. (*Id.*)

The school bus driver testified: school let out at 2:30; Michael always rode the bus home; Petitioner told her he was Michael's uncle, that it was very important Michael not get on the bus, and that Michael knew he was picking him up that day; Michael looked surprised to be getting picked up, but confirmed the person picking him up was his uncle; Petitioner's car started right away. (Tr. Vol. 5 at 61-68.)

A detective testified: the distance from the victim's work to her apartment was 2.3 miles and took approximately 5 minutes to drive; the distance from the apartment to the Sellwood laundromat was 2.5 miles and took roughly 6 minutes; the distance from the

9 - OPINION AND ORDER -

Sellwood laundromat to the Alpine Laundry on Highway 99 was 6.3 miles and took roughly 14 minutes; the distance from the Alpine Laundry to the apartment was 3.8 miles and took about 8 minutes; the distance from the 217 ramp where the truck allegedly broke down to the Alpine Laundry was a 10-12 minute walk. (Tr. Vol. 6 at 130-134.)

The defense conceded Petitioner used and supplied methamphetamine; and that he fraudulently used the victim's debit card and improperly cashed checks on her bank account.[3] Prior to trial, the defense moved to suppress Petitioner's statements to investigators the day of the murder, the following day, and on March 7, 1997. (Tr. on Appeal; Tr. Vol. 3 at 26-34.) The trial court denied the motion, finding Petitioner was not in custody and was free to come and go when he made the statements. (Tr. Vol. 3 at 30-34.) During the trial, the defense challenged the State's evidence that Petitioner committed the murder, eliciting testimony from the investigating officers that they did not observe blood or

---

[3]A corporate investigator with Washington Mutual Bank authenticated financial transaction documents and photographs showing Petitioner cashing checks off the victim's account: #1626, for $100 at 9:57 a.m. 3/1/1997 - Oak Grove Branch; #1627, for $160 at Tigard Branch; #1631 for $250 on 3/3/1997 at Barbour Blvd. Branch; #1632 for $250 at 2:27 p.m. 3/3/1997 at Clackamas South Branch. She also authenticated merchant sales slips debiting the victim's account for ATM transactions: on 3/2/1997, at 16:53 at KC's Tobacco Town for $19.45; on 3/3/1997, at 18:17 at Steve's Market in Oregon City for $47.60; on 3/3/1997, at 8:17 p.m. at KMart in Milwaukie for $65.96. (Tr. Vol. 6 at 103-116.) The documents were entered into evidence.

scratches on Petitioner when they interviewed Petitioner in the hours after the murder; they did not test his clothing for blood; that Petitioner let them photograph him and search his vehicle. (Tr. Vol. 8 at 70-78; 82-83.)  Summarizing the defense position in a motion for directed verdict/acquittal on both counts, counsel argued, "What we have is a period of time where there's dispute as to [Petitioner's] whereabouts.  There is no physical evidence connecting him to the crime, no witnesses to the crime, and no witnesses placing him in the apartment."  (Tr. Vol. 8 at 85.)

The jury returned a unanimous verdict finding Petitioner guilty of Aggravated Murder and Murder.  (Respt.'s Ex. 123.)  After the verdict, the prosecution offered not to seek the death penalty if Petitioner would agree to a sentence of life without the possibility of parole.  Petitioner signed a Stipulation of Sentence on April 9, 2001, which specified:

> David Wayne Bends, the defendant, with the advice and agreement of his attorneys, Robert Goffredi and Jon Martz, hereby agrees with the State of Oregon, through Deputy District Attorneys Norman Frink and John Copic, to the following stipulation of sentence pursuant to ORS 163.150(3)(b):

> The defendant will be sentenced by the court on the charge of Aggravated Murder in Count 1 of the indictment to life imprisonment without the possibility of release or parole as described in ORS 163.105(1)(b).

> The sentence that the court imposes for Count 2 Murder will run concurrent with this sentence.

> Further, the defendant understands that he has an absolute right to a jury sentencing proceeding on Count

1 Aggravated Murder and he voluntarily waives his right to such a sentencing proceeding and agrees to be sentenced by the court pursuant to this stipulation of sentence.

Finally, the defendant expresses his full and complete satisfaction with the representation and advice he has received from his attorneys and states firmly his belief that they have both competently represented him.

(Respt.'s Ex. 103.)  For sentencing, the trial court merged Count 2 - Murder, with Count 1 - Aggravated Murder.  (Respt.'s Ex. 101.)

Petitioner appealed his conviction raising one claim of evidentiary error.  (Respt.'s Ex. 104.)  The Oregon Court of Appeals affirmed Petitioner's conviction from the bench, and the Oregon Supreme Court denied review.  (Respt.'s Exs. 106; 108.)

Petitioner filed for Post-conviction Relief ("PCR") alleging 19 instances of ineffective assistance of trial counsel in Claim 1; 9 instances of ineffective assistance of appellate counsel in Claim 2; and trial court error in Claim 3.  (Respt.'s Ex. 109.)  He filed two supporting exhibits: Exhibit One, consisting of 21 pages with a detailed explanation of each claim; and Exhibit Two, consisting of 319 pages of legal documents.  (Respt.'s Exs. 111-113.)  The PCR trial court denied relief on all claims, issuing an opinion letter, and Findings of Fact, Conclusions of Law.  (Respt.'s Exs. 127; 128.)

Petitioner appealed, presenting one claim of ineffective assistance of trial counsel in a counseled appellate brief, and in a *pro se* supplemental brief sought to present the other claims by

12 - OPINION AND ORDER -

listing them and directing the Court of Appeals to his PCR brief. (Respt.'s Exs. 130; 131.)  The Oregon Court of Appeals granted the State's Motion for Summary Affirmance, and the Oregon Supreme Court denied review.  (Respt.'s Exs. 135; 137.

In this habeas action, with the assistance of appointed counsel, Petitioner filed an Amended Petition for Writ of Habeas Corpus (#14) alleging violation of his Fourteenth Amendment right to due process when the trial court excluded evidence, and alleging numerous instances of ineffective assistance of trial and appellate counsel in violation of his rights under the Sixth and Fourteenth Amendments.

## DISCUSSION

In his Brief in Support of the amended petition, Petitioner argues he is entitled to relief because trial counsel provided ineffective assistance in failing to thoroughly investigate, in particular, Chris Burrata as the most likely suspect, (Ground Two (e));  and because trial counsel provided ineffective assistance by failing to pursue mitigation evidence and "thus were unprepared for the penalty phase of the capital proceeding," (Ground Two(m)). (#31, at 13-16.)  Petitioner contends the state court adjudication of his claims was an unreasonable application of clearly established Federal law and, with respect to the mitigation claim, based on an unreasonable determination of the facts in light of the evidence presented in state court.  (*Id*. at 13, 15.)

13 - OPINION AND ORDER -

Respondent argues Petitioner has failed to meet his burden of proof for habeas relief as to the claims he does not argue in the supporting brief.  (#35, at 2.)  Respondent further contends Petitioner's claims, with the exception of Ground Two (m), are procedurally defaulted and, to the extent the two claims Petitioner argues in his brief were fairly presented to the state courts, the state court adjudication was neither contrary to, nor an unreasonable application of established Federal law.  (*Id.*)

I.  **Unargued Claims**

A petitioner seeking federal habeas relief bears the burden of showing the court he is entitled to relief.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004), *cert. denied* 545 U.S. 1165 (2005).  Under § 2254(d), a petitioner must show that the adjudication of his claims on the merits in State court was: "1) contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Petitioner has not satisfied the burden of proof for habeas relief with respect to the claims that are not argued in his supporting brief.  The Court has, nevertheless, reviewed the record

as to these grounds for relief and determined they would not entitle Petitioner to relief.   Therefore, habeas relief on the unargued claims is precluded.

## II.   The Merits

A.   <u>Standards of Review</u>

Following passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus shall not be granted unless the adjudication on the merits in State court was:

> (1) contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> 2)resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   The Supreme Court has construed this provision as requiring federal habeas courts to be highly deferential to the state court decisions under review.   *Williams v. Taylor*, 529 U.S. 362, 386-389 (2000).   In *Cullen v. Pinholster*, ___ U.S. ___; 131 S.Ct. 1388, 1398-1402 (April 4, 2011), the Court reiterated the highly deferential nature of federal habeas review, and limited federal review "to the record that was before the state court that adjudicated the claim on the merits."

"'Clearly established Federal law' is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."   *Lambert v. Blodgett*, 393

15 - OPINION AND ORDER -

F.3d 943, 974 (9th Cir. 2004) *cert. denied*, 126 S. Ct. 484 (2005). An "unreasonable application" of clearly established federal law occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lambert*, 393 F.3d at 974 (citing *Williams*). "The state court's application of . . . law must be *objectively unreasonable*." *Williams*, 529 U.S. at 411 (emphasis added). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly." *Woodford*, 537 U.S. at 24-25 (2002)(internal citations omitted). Rather, "a habeas court must determine what arguments or theories ... could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision." *Pinholster*, 131 S.Ct. at 1402 (citing *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786 (2011)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, ___ U.S. ___, 131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The last reasoned decision by the state court is the basis for review by the federal court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002). In this proceeding, the Court reviewed the state PCR trial court decision.

In reviewing a state court decision, "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004). This is a standard that will be met in few cases. *Id.* at 1000. When unchallenged, State court determinations of factual issues "shall be presumed to be correct." 28 U.S.C. §2254(e)(1); *Miller-el v. Cockrell*, 537 U.S. 322, 340 (2003). A Petitioner may rebut the presumption of correctness with clear and convincing evidence. *Id.*

The clearly established federal law governing claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *Pinholster*, 131 S.Ct. at 1403. Under *Strickland*, a petitioner must prove: 1) that counsel's performance fell below an objective standard of reasonableness and, 2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Bell v. Cone*, 535 U.S. 685, 695 (2002); *Strickland*, 466

U.S. at 687-88.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome[,]" that is, "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 694; 686.

"Judicial scrutiny of counsel's performance must be highly deferential," *id*. at 689, and "a court must indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S.Ct. at 1407 (quoting *Strickland*) (internal quotation marks omitted.)   The reasonableness of counsel's conduct must be evaluated in light of the facts of the case and the circumstances at the time of representation. *Strickland*, 466 U.S. at 690.   For a petitioner to show prejudice from counsel's deficiencies, more than speculation is required. *Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) *citing Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997)("speculation about what an expert could have said is not enough to establish prejudice"); *Wildman v. Johnson*, 261 F.3d 832 (9th Cir. 2001)(speculation that an expert could be found and would be willing to testify on petitioner's behalf insufficient).

Overall, a doubly deferential standard of review applies to federal habeas review of ineffective assistance of counsel claims:

deference under § 2254 and deference under *Strickland*.  *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420 (2009); *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).

II.  Ground Two (e)

In Ground Two (e) (claim one (h) in the state PCR proceedings) Petitioner alleges he was denied effective assistance of trial counsel because counsel failed to thoroughly investigate Chris Burrata as the most likely suspect.  Petitioner argues, had counsel investigated Chris Burrata, "there is a reasonable probability the outcome of the jury trial would have been different."  (#31, at 14.)

In the PCR court, Petitioner argued the fact his first appointed counsel withdrew due to an insurmountable conflict from having been counsel for Mr. Buratta in other matters is evidence counsel was deficient for not arguing Mr. Buratta was the murderer. (Respt.'s Ex. 110, at 7-8.)   The PCR court denied Petitioner's claim that trial counsel failed to investigate Christopher Buratta, specifying in the Findings of Fact, Conclusions of Law: "In claim (h) of the First Claim for Relief, petitioner has presented no evidence to prove counsel could have produced evidence that Christopher Buratta committed the murder.  There is no evidence to suggest Mr. Buratta committed the murder and all evidence points to petitioner as the person who committed the murder." (Respt.'s Ex. 128, at 9.)   The PCR court also found Petitioner failed to present

19 - OPINION AND ORDER -

the testimony of any of the witnesses he argued should have been investigated and called to testify, and therefore did not meet his burden of showing counsel erred in not pursuing these witnesses. (*Id.*)

The record shows that in withdrawing, Petitioner's first counsel told the trial court: "One way or another [Buratta] will be a witness in the case. *From our perspective* he will be accused of being the person who committed the act, so we were in a position of doing what we do [sic] could to decimate our prior client." (#23, Tr. Vol. 1 at 4, emphasis added.)  Counsel explained that after researching the case and the possibility there would be no conflict, they found "[t]he case is based entirely on a time line on a given day of where people were at such and such a time, and the hope was that this individual [Buratta] was seen at a time completely disparate from the time of death and then this would not be a problem, but that is not how it is." (*Id.* at 5.)

A court reviewing counsel's performance must presume counsel made significant decisions in the exercise of reasonable professional judgment. *Pinholster*, 131 S.Ct. at 1407.  There is evidence in the trial transcript from which the PCR court could find counsel investigated potential witnesses and, for reasons of trial strategy, decided not to call them.  (Tr. Vol. 8 at 52, 84; Tr. Vol. 9 at 3.)  Moreover, trial counsel's affidavit to the PCR trial court specified counsel thought "the case would best be tried

by raising reasonable doubt and attacking the circumstantial evidence; especially because the main witnesses were methamphetamine addicts." (Respt.'s Ex. 125, at 2.) This Court's review of the PCR record confirms that Petitioner failed to show the PCR court counsel could have produced evidence that Christopher Buratta committed the murder or that counsel's representation was constitutionally inadequate. Nor did he show the PCR court there was a reasonable probability the outcome of the trial would have been different had counsel more thoroughly investigated Mr. Buratta. Accordingly, it was neither contrary to, nor an unreasonable application of *Strickland* for the PCR court to deny relief, and habeas relief is precluded.

III. <u>Ground  Two(m)</u>

In Ground Two (m) (claim one (q) in the state PCR proceedings) Petitioner alleges he was denied effective assistance of trial counsel because counsel failed to thoroughly investigate mitigation evidence for the sentencing phase. He argues this failure coerced him into waiving his rights to have the jury decide his sentence. (#31, at 16.)

The PCR court denied Petitioner's claim finding, in relevant part, Petitioner was not credible; he raised the possibility of a sentencing agreement on his own; the sentencing court reviewed the agreement with Petitioner; Petitioner knew what his options were and was aware of the consequences of the agreement; and counsel did

21 - OPINION AND ORDER -

not coerce him or pressure him to accept it.  (Respt.'s Ex. 128 at 10.)  These findings are presumed to be correct absent Petitioner refuting them with clear and convincing evidence.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Petitioner has not satisfied this burden.  Moreover, upon review of the record, the Court finds evidence supporting the PCR courts findings.

In written argument to the PCR court, Petitioner asserted: he told his attorneys he preferred Death Row to Life in prison with no appeal action; he heard from his attorneys multiple times regarding a deal proffered by the State between April 2, 2001, when the jury returned its verdict, and April 9, 2001, when the sentencing phase began; upon appearing in court on April 9th, his attorneys told him his first wife was present and prepared to testify against him, which would bolster the State's case; while incarcerated and awaiting trial he provided his investigator information about his family and friends in California, and the investigator told him he "always prepared his sentencing mitigation ahead of time." (Respt.'s Ex. 112 at 14-16.)

The trial record shows trial counsel told the court at the outset of the sentencing proceeding that Petitioner started talking to them about the plea option the previous week; that they talked about it over the course of several days, including that morning; that counsel believed the plea agreement before the court was the result of an informed decision.  (Tr. Vol. 11 at 3.)  Petitioner

22 - OPINION AND ORDER -

told the trial court he understood the agreement and that he was giving up his right to have the jury decide his sentence; he stated he was taking the plea on the advice of counsel, but counsel had not coerced him to do so.  (*Id*. at 5-6.)  The record also shows that several of Petitioner's family members from California were called as defense witnesses at trial.

Petitioner has not shown that the PCR court's adjudication was based on an unreasonable determination of the facts in light of the evidence before the court.  Moreover, Petitioner failed to show the PCR court that counsel did not investigate mitigation evidence, and failed to show what evidence mitigation investigation would have yielded.   Accordingly it was neither contrary to, nor an unreasonable application of *Strickland*, for the PCR court to deny his claim and habeas relief is precluded.

IV.  Evidentiary Hearing

Under *Pinholster*, review under § 2254(d) is limited to the record before the state court.  131 S.Ct. at 1398.  Petitioner has not shown he is entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2)(A)(i)-(ii).

/ / /

/ / /

**<u>CONCLUSION</u>**

The Amended Petition for Writ of Habeas Corpus (#14) is DENIED, and this proceeding is dismissed with prejudice. The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this  8th  day of February, 2012.


                              /s/ Marco A. Hernandez
                              Marco A. Hernandez
                              United States District Judge